UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MARLON L. SIAS,                                    CIVIL NO. 04-3832 (JNE/JSM)

       Plaintiff,

v.                                                 REPORT AND RECOMMENDATION

FRED OTTO HERZOG, et al.,

       Defendants.


     The above matter is before the undersigned on Defendant Byron Nernoff's Motion for Summary Judgment [Docket No. 40] and Defendant Fred Otto Herzog's Motion to Dismiss [Docket No. 41].  The matters were decided on the written submissions of the parties.

     This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).  Based upon the pleadings, and for the reasons discussed below, it is recommended that:

    1.    Defendant Byron Nernoff's Motion for Summary Judgment [Docket No. 40] be **GRANTED**.

    2.    Defendant Fred Otto Herzog's Motion to Dismiss [Docket No. 41] be **GRANTED**.

## I.    FACTUAL BACKGROUND

     Plaintiff Marlon Sias ("Sias") brought this action against multiple defendants, including Byron Nernoff ("Nernoff") and Fred Otto Herzog ("Herzog"), alleging six counts of violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and additional counts of

deceptive trade practices, false statements in advertising, common law fraud, and violation of the Uniform Fraudulent Transfer Act.

Specifically, Sias alleged that in Sias and Herzog, a minister, began a friendship 1972. Compl. ¶¶ 19-21. In addition to being a minister, Herzog engaged in business through "Spiritual Consultants" and "Fred Herzog and Associates" ("FHA"), providing clients with a variety of business-related services. Compl. ¶¶ 23, 24. According to Sias, Herzog, individually and through FHA, along with the other defendants, induced Sias and others to invest in three different schemes: the Growth Benefit Systems Scheme ("GBS Scheme"), the "Claude White Scheme," and the Clark 2001 Subscriber Trust ("Clarke Trust") Scheme. Compl. ¶ 25.

### A.   GBS Scheme

With regard to the GBS Scheme, Sias alleged that Herzog and other defendants told him they were looking for investors for a "prime bank trading program" involving a "letter of credit trading program." Compl. ¶ 26. Herzog told Sias and other individual investors that they would receive a return of 20% per month, compounded for thirteen months. Id. After providing Sias with initial information on GBS, Herzog continued to persuade Sias to invest in GBS, telling Sias that the others involved in GBS were fellow Christians who shared a common faith, and that Herzog had received a sign from God that Herzog should invest $10,000 in GBS. Compl. ¶¶ 27, 28. Sias also received additional documents from Herzog, who represented he had received them from Nernoff and others. Compl. ¶ 29. The documents included the following representations, among others:

- GBS generated returns on investment by trading letters of credit of "top rated banks;"

2

- Investor funds would be pooled to purchase a $250,000 letter of credit that would be used in a trading program designed to yield 20% per month for thirteen months;

- Investor's principal would be guaranteed by a promissory note, which provided an 8% return, payable in thirteen months;

- The GBS program was "secure" because "every purchase is made with a pre-arranged exit profit," and

- Investors would be repaid their principal plus interest thirteen months after the date of their investment.

Compl. ¶ 29. Based on these representations, on February 23, 2003, Sias invested $35,000 in GBS. Compl. ¶ 30. After Sias invested in GBS, Nernoff mailed monthly financial reports to Sias about his investment that stated that it had been pooled; that it was secure; that it was compounding and returning profits as promised; and that by April 15, 2001, it had grown in valued to an amount exceeding $374,000. Compl. ¶ 31. Similarly, Herzog repeatedly assured Sias that GBS was trading, his funds were pooled and compounding, and that the GBS statements accurately reflected the amount of money that Sias' investment had earned. Compl. ¶ 32. Sias was never paid his $35,000 principal investment or the $339,000 of interest. Compl. ¶ 33. Rather, Herzog assured Sias and other victims of the GBS Scheme that the funds would be repaid. Id.

## B.   Claude White Scheme

With regard to the Claude White scheme, Sias alleged that in April 2000, Herzog told him that God was going to bless Sias financially and then Herzog provided Sias with information regarding investment opportunities. Compl. ¶ 35. By August 2000, Herzog and other defendants convinced Sias and other individuals to invest in another "prime bank

trading" scheme that were represented to be an "outstanding investment," and would generate very high returns and was secure. Compl. ¶ 36. However, before Sias received the paperwork for this new investment opportunity, Herzog told Sias and other individuals that the opportunity had closed. Compl. ¶ 36. Then, at the end of August 2000, Herzog told Sias about Claude White and said that Claude White wanted to help Sias and other individuals to "piggyback" on White's investment in another prime bank trading program. Compl. ¶ 37. In the beginning of September 2000, Herzog, another defendant, and Claude White represented to Sias, that:

(a)   Claude White was putting together a one hundred million dollar investment;

(b)   that the investment would be used to fund a "high yield" overseas trading program;

(c)   that Claude White had "almost all" the money he needed, but just needed a "little more" to reach the hundred million;

(d)   that, although Sias funds could not remain in Sias' own bank account (as was purported to be the case in the previous investment opportunity), Sias' money would be secure as a leading European Bank would issue a $100 million written guarantee of Claude White's investment; and

(e)   that the investment would generate a 50% non-compounded return per month for a period of ten months.

Compl. ¶ 38. In reliance on the representations made by defendants, Sias invested $450,000 with Claude White, along with other individuals. Compl. ¶ 40, 59. Claude White did not pay the return on Sias' investment as represented. Compl. ¶ 42. However, Claude White, Herzog, and other defendants continued to assure Sias that his funds were secure because of the bank guarantees. Compl. ¶¶ 42, 43, 55(f), 57.

4

### C.   **The Clarke Trust Scheme**

In June 2001, Herzog approached Sias regarding the Clarke 2001 Subscriber Trust. In this regard, Sias alleged that Herzog transmitted several documents to him and other victims, including a document entitled "USD $1,000,000 AND UP PRIVATE PLACEMENT TRUST ARRANGEMENT Revised July 7, 2001 ("Trust Arrangement"), which contained the following representations about the Clarke Trust:

- "A very strong Trust Arrangement is in place with domestic Financial Institution.  The trust is non-depleting and licensed in the State of California;"

- "The Trust must honor a written request by the Investor to withdraw the principal as per the Founding Settlor's notarized letter;" and

- "Profits accumulate in the Investor's name in an Internal Pool in Private Banking in another Financial Institution, and in the Investment Trust Account for compounding at 25% of weekly profits."

Compl.  ¶  45(a)(emphasis in original).   Other documents included charts that depicted investment growth and profits Sias and other victims could expect to receive from his investment.  Compl.  ¶ 45(b), (c).  For example, one chart showed a $100,000 investment growing to $9,679,102 in eight weeks.  Sias was told by Herzog and others that he could expect to earn in eight weeks 1.5 times the earnings on this chart.  Compl. ¶ 45(b).  A second chart,  entitled  "CHART  #1,  25%  PROFITS  COMPOUNDED  INTERNALLY  AND EXTERNALLY," showed profits from a $1.0 million investment in a "'non-depletion, registered Trust Account's compounding at 5% per day, or 25% per week, or 25% + per week starting Week 2 and thereafter each seven days." Compl. ¶ 45(c). Herzog and others told Sias that if he invested in the Clarke Trust, he could expect his investment would generate the profits depicted  on  the  chart.   Id.   On  July  17,  2001,  Sias  received  a  "LETTER  OF

UNDERSTANDING AND ACKNOWLEDGEMENT" ("Acknowledgement Letter") that provided the "Registered Trust Bank" information for Sias' funds transfer and stated that "[a]fter your funds are on deposit in the REGISTERED TRUST NON-DEPLETING ACCOUNT, the TRUST will send by courier your NUMBERED CERTIFICATE reflecting the amount on deposit." Compl. ¶ 47. The Acknowledgement Letter also stated "****NOTE; THE BANK IS NOT INVOLVED WITH THIS PRIVATE PLACEMENT TRUST ARRANGEMENT –INVESTORS MUST NOT CALL OR VISIT THE BANK." Compl. ¶ 47. The following day, Sias invested $150,000 in the Clarke Trust. Compl. ¶ 50. Thereafter, defendants continued to make false representations to Sias regarding the Clarke Trust. See Compl. ¶ 55(a-e, g-k).

On August 18, 2004, Sias filed this lawsuit, asserting the following causes of action: (1) six counts of violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), (d); (2) deceptive trade practices, in violation of Minn. Stat. § 325D.44; (3) false statements in advertising, in violation of Minn. Stat. § 325F.67; (4) common law fraud; and (5) violation of the Uniform Fraudulent Transfer Act, Cal. Civ. Code §§ 3439-3439.12.

In his Complaint, Sias alleged that defendants obtained money for these schemes from not only Sias, but from other "victims," "investors," "participants," and the "investment group." See Compl. ¶¶ 47, 55(a-e, g-k), 56, 57, 120, 121, 125). In addition, Sias alleged that the defendants represented that the money from the investors would be pooled. See Compl. ¶¶ 29, 31, 32, 34, 55(b), (d). Sias further alleged that defendants advertised these schemes and made misrepresentations to potential investors, church members, and the general public. See Compl. ¶¶ 121, 125, 126.

On December 1, 2005, defendant Nernoff filed a motion for summary judgment,[1] asserting that all Counts lodged against him (Counts 2, 7-9) should be dismissed because (1) this "security investment complaint" is barred by the three-year statute of limitations applicable to securities actions, and (2) Sias' RICO claim against Nernoff is a security fraud claim, and thus, is precluded from being brought under RICO.[2]

On December 8, 2005, defendant Herzog filed a motion to dismiss, asserting that the Court should dismiss Counts One through Six against him on grounds that plaintiff failed to state a claim upon which relief can be granted. In this regard, Herzog argued that the schemes were investment contracts in which Sias invested money in order to receive profits due to the management efforts of others. Therefore, Herzog maintained, the schemes were "securities", and suits arising out of the sale of securities are expressly prohibited by RICO. As to Count Nine, Herzog maintained that Sias failed to state his fraud claim with particularity in violation of Federal Rule of Civil Procedure 9(b).[3]

---

[1]     Nernoff titled his pro se motion as a motion for summary judgment. However, the Court finds that the motion is more appropriately characterized as a motion to dismiss because the motion relies exclusively on the adequacy of the allegations contained in the Complaint. Therefore, the Court will treat Nernoff's motion as a motion to dismiss.

[2]     While Nernoff focused his arguments on the issue of whether the schemes amounted to securities, he did not explain to the Court why such a finding would require dismissal of Sias' state law claims of deceptive trade practices, false statements in advertising, and common law fraud (i.e. Counts 7-9).

[3]     On January 4, 2006, this Court issued an Order, giving Nernoff and Herzog the opportunity to file a reply to plaintiff's response, on or before January 23, 2006. [Docket No. 45]. Neither defendant filed a reply by January 23, 2006. Instead, Herzog called the Court on January 25, 2006, to request a continuance of the hearing currently scheduled for February 6, 2006 regarding his motion to dismiss because he wanted to make additional arguments. In a return phone call, this Court advised Herzog that he had three choices: (1) he could leave his motion on as scheduled; (2) he could leave his motion on as scheduled and also bring a

In opposition to these motions, Sias maintained that the motions to dismiss should be denied.  Sias argued that his RICO claims do not arise out of his purchase of "securities" and are not precluded by the Private Securities Litigation Reform Act ("PSLRA").  Sias also contended that because he had not alleged any claims of securities fraud, the proper statute of limitations period is four years for RICO claims, and his claims are not barred.  Additionally, Sias argued that Count Nine of the Complaint meets the standard under the Federal Rule of Civil Procedure 9(b) because his fraud claim regarding the Claude White scheme was pled with the requisite particularity.

## II.   **STANDARD OF REVIEW**

"Dismissal under Rule 12(b)(6) serves to eliminate actions which are fatally flawed in their legal premises and destined to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity."  Young v. City of St. Charles, Mo., 244 F.3d 623, 627 (8th Cir. 2001).   In reviewing a motion to dismiss, the Court must accept as true all factual allegations contained in the complaint and afford the plaintiff all reasonable inferences to be drawn from those facts.  Meyer v. City of Joplin, 281 F.3d 759, 760-61 (8th Cir. 2002) (citing Young v. City

---

motion to amend the Pretrial Scheduling Order to allow him to bring another motion; or (3) he could withdraw his motion and make a motion to amend the Pretrial Scheduling Order to allow him to bundle all of his motions together.  Notwithstanding this communication from the Court, Herzog filed a supplemental memorandum, dated February 2, 2006, in which he made additional arguments as to why the Court should dismiss the entire lawsuit against him, with prejudice.  In a letter from Sias' counsel to the Court, dated February 14, 2006, Sias objected to the supplemental memorandum because it was not a reply brief in that it raised new arguments.  Sias is correct.  The Court will not consider Herzog's February 2, 2006 supplemental memorandum because Herzog filed it without leave of court, and made new arguments bearing on Counts 7 and 8, to which Sias had no opportunity to respond.  On the other hand, the Court did consider a letter from Herzog, dated February 16, 2006, which while not timely filed, nor in the form or type of pleading contemplated by Local Rule 7.1, did constitute a reply to the arguments made by Sias in his response.

of St. Charles, 244 F.3d 623, 627 (8th Cir. 2001)).  Dismissal is appropriate only if it appears beyond doubt that the plaintiff cannot prove any set of facts in support of the claim that would entitle him to relief.  See Turner v. Holbrook, 278 F.3d 754, 757 (8th Cir. 2002) (citing Sisley v. Leyendecker, 260 F.3d 849, 850 (8th Cir.2001)).  "[D]ismissal under Rule 12(b)(6) is likely to be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief."  Gebhardt v. ConAgra Foods, Inc., 335 F.3d 824, 829 (8th Cir. 2003) (citations omitted).

III.   **DISCUSSION**

The core issue presented to the Court by the motions to dismiss is whether the investment schemes pled by Sias amount to "securities" as defined by the Securities Acts,[4] and therefore, preclude him from asserting his RICO claims.  In particular, the issue is whether the schemes alleged by Sias are "investment contracts," as argued by Herzog and Nernoff, or "non-security notes" as maintained by Sias.  If the schemes are deemed to be securities, then Sias' RICO claims must be dismissed, leaving this Court to decide whether it will exercise supplemental jurisdiction over his remaining state claims.  If this Court concludes that Sias' RICO claims do survive the motions to dismiss, the Court will then address Herzog's additional claim that Sias' common law fraud claim must be dismissed because it has not been pled with sufficient particularity pursuant to Rule 9(b).

---

[4]   The Supreme Court has "consistently held that '[t]he definition of a security in § 3(a)(10) of the 1934 Act, ··· is virtually identical [to the definition in the Securities Act of 1933] and, for present purposes, the coverage of the two Acts may be considered the same.' United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 847, n.12, 95 S.Ct. 2051, 2058, n. 12, 44 L.Ed.2d 621 (1975) (citations omitted). We reaffirm that principle here."  Reves v. Ernst & Young, 494 U.S. 56, 61 n.1 (1990).

Counts One through Six of Sias' Complaint allege that the defendants engaged in various acts of mail, wire and bank fraud, all of which violated RICO, 18 U.S.C. § 1962 (c) and (d).  However, in 1995, Congress passed the PSLRA, which amended RICO, 18 U.S.C. § 1964(c), to provide that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of [RICO]."  18 U.S.C. § 1964(c); see Stephenson v. Deutsche Bank AG, 282 F.Supp.2d 1032, 1071 (D. Minn. 2003). The "amendment to the RICO statute was intended not only 'to eliminate securities fraud as a predicate offense in a civil RICO action,' but also to prevent a plaintiff from 'plead [ing] other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.'" Stephenson, 282 F.Supp.2d at 1071 (quoting H.R. Conf. Rep. No. 104-369, at 47 (1995), U.S. Code Cong. & Admin. News 1995, pp. 730, 746 (as quoted in Bald Eagle Area School Dist. v. Keystone Financial, 189 F.3d 321, 327 (3d Cir. 1999)).

Under the Securities Exchange Act of 1934 ("SEA"), the term "security," as defined in 15 U.S.C. § 78c(a)(10), means:

> The term "security" means any note, stock, treasury stock, security future, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any

renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(a)(10).

Here, Herzog and Nernoff argued the financial schemes alleged by Sias are investment contracts; Sias claims they are non-security notes.  The SEA does not define "note" or "investment contract."  However, the Supreme Court has provided guidance to the courts and litigants as to those financial devices that constitute notes and investment contracts and those that do not.  The starting place is the Supreme Court's articulation regarding the scope of the SEA in Reves v. Ernst & Young, 494 U.S. 56, 60 (1990):

> The fundamental purpose undergirding the Securities Acts is "to eliminate serious abuses in a largely unregulated securities market."  United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 849 (1975).  In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," SEC v. W.J. Howey Co., 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946), and determined that the best way to achieve its goal of protecting investors was "to define 'the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.' " Forman, supra, 421 U.S., at 847-848, 95 S.Ct., at 2058-2059 (quoting H.R.Rep. No. 85, 73d Cong., 1st Sess., 11 (1933)). Congress therefore did not attempt precisely to cabin the scope of the Securities Acts.  Rather, it enacted a definition of "security" sufficiently broad to encompass virtually any instrument that might be sold as an investment.
>
> Congress did not, however, "intend to provide a broad federal remedy for all fraud." Marine Bank v. Weaver, 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982). Accordingly, "[t]he task has fallen to the Securities and Exchange Commission (SEC), the body charged with administering the Securities Acts, and ultimately to the federal courts to decide which of the myriad financial transactions in our society come within the coverage of these statutes." Forman, supra, 421 U.S., at 848, 95 S.Ct., at 2059. In discharging our duty, we are not bound by legal formalisms, but instead take account of the economics of the transaction under investigation. See, e.g., Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967) (in interpreting the term "security," "form should be disregarded for substance and

the emphasis should be on economic reality"). Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called.

Reves, 494 U.S. at 60-61 (footnote omitted).

The Supreme Court in Reves then identified a list of instruments commonly denominated "notes" that are not securities.  Such instruments include:

the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized).

Id. at 65.  To determine whether an instrument denominated a "note" is a "security," courts must apply the "family resemblance" test.  Reves, 494 U.S. at 67.  In this regard, the Supreme Court stated that "[a] note is presumed to be a 'security,' and that presumption may be rebutted only by a showing that the note bears a strong resemblance (in terms of the four factors we have identified) to one of the enumerated categories of instrument. If an instrument is not sufficiently similar to an item on the list, the decision whether another category should be added is to be made by examining the same factors."  Id.  The four factors to be analyzed to determine whether a note bears a strong resemblance to one of the enumerated categories are as follows:

First, we examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it. If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security." If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a "security."

Second, we examine the "plan of distribution" of the instrument, SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344, 353, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943), to determine whether it is an instrument in which there is "common trading for speculation or investment," id., at 351, 64 S.Ct., at 123.

Third, we examine the reasonable expectations of the investing public: The Court will consider instruments to be "securities" on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not "securities" as used in that transaction.

Finally, we examine whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary.

Reves, 494 U.S. at 66-67.  "Profit" in the context of a security "note" means "a valuable return on investment" and includes interest.  Id. at 68 n.4.

As to what comprises an "investment contract," the Supreme Court instructs the courts that the term derives from state blue sky laws in existence before the adoption of the SEA, and that it has been broadly construed by state courts to "mean a contract or scheme for 'the placing of capital or laying out of money in a way intended to secure income or profit from its employment.'"  S.E.C. v. Edwards, 540 U.S. 389, 394 (2004) (citing S.E.C. v. W.J. Howey Co., 328 U.S. 293, 298 (1946) (citing State v. Gopher Tire & Rubber Co., 146 Minn. 52, 56, 177 N.W. 937, 938 (1920)).  Thus, "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise."  Howey, 328 U.S. at 298-99.  Such a definition "permits the fulfillment of the statutory purpose of compelling full and

13

fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.'" Id. at 299 (citing  H. Rep. No. 85, 73rd Cong., 1st Sess., p. 11).  The definition also "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." Id.  "Furthermore, in defining securities, substance governs form, and the substance of an investment contract is a security-like interest in a 'common enterprise' that, through the efforts of the promoter or others, is expected to generate profits for the security holder, either for direct distribution or as an increase in the value of the investment."  Top of Iowa Co-op. v. Schewe, 6 F.Supp.2d 843, 851 (N.D. Iowa 1998) (citing Howey, 328 U.S. at 298-99).  As to what is meant by "profits" in the context of an investment contract, the Supreme Court stated: "when we held that 'profits' must 'come solely from the efforts of others,' we were speaking of the profits that investors seek on their investment, not the p rofits of the scheme in which they invest. We used 'profits' in the sense of income or return, to include, for example, dividends, other periodic payments, or the increased value of the investment." Edwards, 540 U.S. at 394.

In order to meet the "common enterprise" prong of the Howey test, courts around the country have struggled with discerning whether vertical or horizontal commonality, or both, must exist.  See Schewe, 6 F.Supp.2d 843, 852 (stating that because the Eighth Circuit has not ruled on whether either vertical or horizontal commonality or both are required under the "common enterprise" prong of  Howey, the court examined the contracts for either kind of commonality); De Wit v. Firstar Corp., 879 F.Supp. 947, 979-80 (N.D. Iowa 1995) ("In the face of the Eighth Circuit Court of Appeals' long silence on the issue, this court is persuaded that

14

the weight and better reasoned of the more recent decisions, and the purpose of the securities

acts to provide uniform disclosure, show that horizontal commonality is an essential element of

the definition of an investment contract security."); see also S.E.C. v. SG Ltd., 265 F.3d 42, 49

(1st Cir. 2001)  (citing and discussing the different standards in courts across the country);

S.E.C. v. Pinckney, 923 F.Supp. 76, 81 (E.D.N.C.1996) (same). "As a general guide, 'vertical

commonality' requires only a pooling of the interests of the developer or promoter and each

individual investor, while 'horizontal commonality' requires as well a pooling of interests among

the investors, described by the court in Wals as 'a wheel and not just a hub and a spoke.'"

Schewe, 6 F.Supp.2d 843, 852 (citing Wals v. Fox Hills Development Corp., 24 F.3d 1016,

1017-18 (7th Cir. 1994)).

>   Further, the courts have identified two kinds of vertical commonality:
>
>   In an enterprise marked by vertical commonality, the investors' fortunes need not
>   rise and fall together; a pro-rata sharing of profits and losses is not required.
>   Two distinct kinds of vertical commonality have been identified: "broad vertical
>   commonality" and "strict vertical commonality." To establish "broad vertical
>   commonality," the fortunes of the investors need be linked only to the efforts of
>   the promoter. See Long v. Shultz Cattle Co., Inc., 881 F.2d 129, 140-41 (5th
>   Cir.1989). "Strict vertical commonality" requires that the fortunes of investors be
>   tied to the fortunes of the promoter. See Brodt v. Bache & Co., 595 F.2d 459,
>   461 (9th Cir.1978).

De Wit v. Firstar Corp., 879 F.Supp. at 979 (emphasis in original).  However, even as to those

that have stated there must be vertical commonality to find an investment contract, the courts

are not in agreement as to whether strict or broad commonality is required.  See e.g. Revak v.

SEC Realty Corp., 18 F.3d 81, 87 (2d Cir. 1994) (rejecting broad vertical commonality);

Hocking v. Dubois, 885 F.2d 1449, 1459 (9th Cir. 1989) (adhering to narrow vertical

commonality); Villeneuve v. Advanced Bus. Concepts Corp., 698 F.2d 1121, 1124 (11th Cir.

1983), aff'd en banc, 730 F.2d 1403 (11th Cir. 1984) (adhering to broad vertical commonality); SEC v. Koscot Interplanetary, Inc., 497 F.2d 473, 478-79 (5th Cir. 1974) (adhering to broad vertical commonality).

**A.    Sias' Position**

With this background in mind, the Court will now present Sias' position with respect to each of the three schemes and then analyze each scheme in light of the law just discussed.

**1.    The GBS Scheme**

Sias asserted that he loaned money to GBS for thirteen months so that GBS could purchase a line of credit.  In exchange, Sias stated that he was guaranteed an 8% rate of return.  On these facts, Sias argued that he gave money to GBS on the basis of a note that did not constitute a security.  Pl.'s Mem., at 11.

Applying the first Reves factor to the scheme, Sias asserted that the motivation for the transaction was not for Sias to give money to GBS for its general use or to finance substantial investments.  Pl.'s Mem., at 11.  Instead, Sias argued that he gave the money to GBS for the purchase of a $250,000 line of credit that was secure because it was guaranteed by a promissory note and the "exit-profit" on the letter of credit would be established by GBS before the purchase.  Id.  Sias then argued that because there was a guarantee, the scheme was less likely a security, because principal is always at risk in a securities transaction.  Id. at 11-12.  In addition, Sias contended that the transaction was initiated by GBS, not Sias, and that in non-securities loan transactions, the impetus comes from the borrower who needs the lender's money to finance a particular acquisition.  Id. at 12.

16

As to the second Reves factor, Sias asserted that there was no secondary market upon which he could trade his loan to GBS, and no allegations that GBS solicited any members of the public, let alone "a broad segment of the public," for contributions to the guaranteed letter of credit. Id. at 12-13. In this regard, Sias argued that he essentially made a private loan to GBS for the purpose of acquiring the letter of credit. Id. at 13.

With regard to the third Reves factor, Sias asserted that GBS never publicly advertised its desire to borrow money to finance the acquisition of the letter of credit and it did not offer the opportunity to the public. Id. at 13. In this regard, Sias argued that the Complaint provides no basis to infer that the public had any expectations about the GBS Scheme, and specifically, no expectations that it was regulated by the federal securities laws. Id.

As to the fourth Reves factor, Sias asserted that while the GBS Scheme was not insured by the Federal Deposit Insurance Corporation ("FDIC"), Sias was told that his principal investment and an 8% rate of return within thirteen months would be guaranteed by a promissory note from GBS, and that the exit profit would be arranged before the letter of credit was even purchased. Id. at 13-14. In this regard, Sias argued that such risk-reducing factors are not present in the typical securities transaction and as such, their presence militates against a finding that the note was a security. Id.

## 2.   The Claude White Scheme

Sias asserted that he essentially loaned White money so that he would have sufficient funds to acquire a $100 million "high-yield" overseas bank trading program. In exchange, Sias was promised a 50% rate of return compounded monthly for ten months. On these facts, Sias

argued that he gave money to White on the basis of a note that did not constitute a security. Id. at 14.

Applying the first Reves factor, Sias asserted that he did not give money to White for his general use or to finance substantial investments. Id. Instead, Sias asserted that when White solicited funds from Sias, he said that he had "almost all" the money but needed just a "little more" to reach the $100 million plateau. Id. at 14-15. Sias was approached because White needed money from Sias to finance the $100 million instrument. Id. at 15. Further, Sias asserted that White said the investment would be guaranteed by a leading European bank, later identified as Deutsche Bank. Id. Taking these facts into consideration—the lending of funds to facilitate the borrower's cash flow, a loan intended for a specific transaction, a guaranteed loan that does not place the principal at risk—Sias argued that they indicate that the transaction between Sias and White involved a non-security note. Id.

Addressing the second Reves factor, Sias asserted that there was no secondary market upon which Sias could trade his loan to White, and no allegations that White solicited any members of the public, much less a broad segment of the public, for contributions to the prime bank trading program. Id. In this regard, Sias argued that he essentially made a private loan to White for the purpose of acquiring the prime bank trading program. Id. at 16.

With respect to the third Reves factor, Sias asserted that White never publicly advertised his desire to borrow money to finance the acquisition of the prime bank trading program and he did not offer the opportunity to the public. Id. In this regard, Sias argued that the Complaint provides no basis to infer that the public had any expectations about the Claude

18

White Scheme, and specifically, no expectations that it was regulated by the federal securities laws.  Id.

Regarding the fourth Reves factor, Sias asserted that while the Claude White Scheme was not insured by the FDIC, Sias was told that his investment would be guaranteed by a leading European bank.  Id.  In this regard, Sias argued that such risk-reducing factors are not present in the typical securities transaction and support an inference that Sias had no expectation that the investment was regulated by any governmental entity in the United States. Id.

### 3.      The Clarke Trust Scheme

Sias claimed that he essentially loaned the Clarke Trust money so that the Trust could fund "a very big humanitarian project."  Id. at 17.  In exchange, Sias was promised a 25% rate of return per week for eight weeks.  On these facts, Sias argued that he gave money to the Clarke Trust on the basis of a note that did not constitute a security.  Id.

With respect to the first Reves factor, Sias asserted that he did not give money to the Clarke Trust for its general use or to finance substantial investments.  Id.  In this regard, Sias asserted that he gave money to the Clarke Trust so that it could fund a particular humanitarian project.  Id.  Further, Sias asserted that he was told that his funds would be held in a non-depleting trust account at a registered trust bank licensed in California, and therefore, he did not believe that he was putting his principal at risk.  Id.

As to the second Reves factor, Sias asserted that his interest in the Clarke Trust was not liquid and not offered to the general public—it was a private placement.  Id. at 18.  In this regard, Sias argued that he essentially made a private loan to the Clarke Trust for the purpose

of funding a humanitarian project, because the Clarke Trust had no plan of distribution that would enable Sias to engage in common trading for speculation or investment in the Trust. Id.

Applying the third Reves factor, Sias asserted that the Clarke Trust never publicly advertised its desire to borrow money or offered the opportunity to the public. Id. This was a private placement. Id. In this regard, Sias argued that the Complaint provides no basis to infer that the public had any expectations about the Clarke Trust Scheme, and specifically, no expectations that it was regulated by the federal securities laws. Id.

Regarding the fourth Reves factor, Sias asserted that the solicitation materials stated that his funds would remain in a non-depleting bank account in a California registered trust bank, and that the deposit would be evidenced by a numbered certificate. Id. In this regard, Sias argued that it was reasonable to infer that he believed his money would remain in an account insured by the FDIC while the trust was using the money, and such a belief negates against finding the investment to be a security. Id. at 19.

Finally, Sias argued that his loan to the Clarke Trust is expressly excluded from coverage as a security because the note had a maturity date of less than nine months. Id.


**B.    Analysis**

The Court finds that Sias' investments in the GBS Scheme, Claude White Scheme, and the Clarke Trust Scheme, as pled by Sias in his Complaint, are securities and are not non-security notes as argued by Sias. Specifically, the Court concludes that these schemes are investment contracts, and on that basis, recommends that Sias' RICO counts be dismissed.

**1.    The Schemes Are Not "Non-Security Notes"**

20

Turning to the first <u>Reves</u> factor, while Sias argued that his investments were nothing more than loans to the promoters of all three schemes, as a preliminary matter this Court observes that he never alleged these transactions were loans in his Complaint. However, focusing upon the substance of the allegations in the Complaint, it is clear that the purpose of these schemes was not to borrow money for a particular personal or commercial purpose, but to raise funds from Sias and others for the use of a business enterprise or to finance substantial investments. For example, in the GBS Scheme, investor funds were to be pooled to purchase a $250,000 line of credit to be used in a trading program. Compl. ¶ 29. In the Claude White Scheme, the money was to be utilized for a $100 million investment to fund a high yield overseas trading program. Compl. ¶ 38. In the Clark Trust Scheme, Sias transferred $150,000 to a "$1,0000,000 AND UP PRIVATE PLACEMENT TRUST ARRANGEMENT" for the purpose of accumulating profits, compounding at 25% or more per week.[5] Compl. ¶¶ 45, 118. There is nothing about any of these schemes to suggest that they resemble any of the types of notes excluded by the Supreme Court in <u>Reves</u> (<u>e.g.</u> a note delivered in consumer financing, a note secured by a mortgage on a home, a short-term note secured by a lien on a small business or some of its assets, notes for commercial operations), or found by other courts not to be a note governed by the SEA. <u>See, e.g.</u>, <u>Great Rivers Co-op.</u> <u>of Southeastern Iowa v. Farmland Industries, Inc.</u>, 198 F.3d 685, 699-70 (8th Cir. 1999) (finding that the capital credits were not security notes given they were non-interest bearing,

---

[5]     Sias argued that the moneys he lent to the Clarke Trust was for a humanitarian project. Pl.'s Mem., at 17. However, the only reference to a "humanitarian project" was at paragraphs 45(b) and 55(a) of the Complaint. This Court does not interpret these references as a statement by Sias that his moneys were loaned to the Clarke Trust to fund a humanitarian project.

paid no dividends, did not appreciate in value, had no liquidity, and were not issued to raise money for the general business use of the cooperative or to finance substantial investments); Equitable Life Assur. Soc. of U.S. v. Arthur Andersen & Co., 655 F.Supp. 1225, 1236 (S.D.N.Y. 1987) (where the agreement between the parties was drafted in a form of a loan transaction, negotiations were based on standard loan forms, the obligation was not subordinated to other indebtedness, and the plaintiff retained significant control over borrower's financial operations and uses of proceeds, court concluded that the notes at issue bore a strong family resemblance to notes evidencing loans by commercial banks for current operations and were not securities).

In addition, while Sias would like this Court conclude that each scheme was a loan because of the interest each venture would generate, neither the facts nor the law support such a conclusion. First, each enterprise promised enormous income or rates of returns. The GBS Scheme promised a "yield" of 20% per month for thirteen months; the Claude White Scheme pledged a 50% non-compounded return per month for a period of ten months; and the promoters of the Clarke Trust Scheme represented that profits would accumulate in the investor's name, compound at a range of 5% per day to 25% or more a week, and a $100,000 investment would grow to in excess of $9.0 million in 8 weeks. Compl. ¶¶ 29, 38, 45(a)-(c). Moreover, even if each scheme was characterized solely by the promise of "interest," the presence of interest is not dispositive. In the context of "notes," "profits" means "'a valuable return on investment,' which undoubtedly includes interest." Reves, 494 U.S. at 68 n.4.

Based on the allegations of the Complaint, it is evident that it is the income (whether labeled "profits" or "interest" or otherwise) of each of the schemes that was driving force

behind each venture.  Under these facts, this Court concludes that Sias was investing in a business enterprise, and not making a loan to each promoter.

Applying the second Reves factor to all the schemes, the Court finds the schemes were offered and sold to a broad segment of the public.  Throughout the Complaint, Sias referred to investors and "other victims" of the GBS Scheme and alleged that his funds would be "pooled" with their funds; in the Claude White Scheme and Clark Trust Scheme, he referred to "other individuals", "other victims" or "all participants."  Compl. ¶¶ 26, 29, 31-34, 36, 37, 40, 41, 45(c), 46, 54, 55, 56.   Additionally, Sias alleged that defendants, through all three schemes, "attempted to induce other individuals, friends and acquaintances" to invest in the schemes, made misrepresentations to "potential investors, church members and the general public" regarding all three schemes, and placed "before the public in the State of Minnesota " advertisements regarding all three ventures.   Compl. ¶¶ 25, 121, 125-26.   While these schemes were not traded on an exchange, they were offered and sold to a broad segment of the public, which is enough to establish the "common trading" prong of the Reves test.  See Reves, 494 U.S. at 68 (stating that while notes were not traded on an exchange, but offered and sold to a broad segment of the public, was all that was required to establish the requisite "common trading" in an instrument).

With respect to the third Reves factor, the Court finds that the schemes were held out to be investments to Sias and the other participants and not loans.  Sias referred to the GBS Scheme as an investment, alleged that Herzog was looking for investors, and stated that "investor funds would be pooled".  Compl. ¶¶ 26, 29, 32-34.  Similarly, in both the Claude White Scheme and the Clarke Trust Scheme, Sias described these ventures as investments,

investment opportunities and investment programs, and called the participants of the programs "investors." Compl. ¶¶ 36, 37, 38, 40-42, 44-46, 50, 51, 55(b), (d), (f), (j), 56, 57. Further, nothing in the Complaint suggests that any of the schemes were looking for people to loan them money or that any of the participants believed they were merely lending money to the promoters to purchase an asset, good, or for some other consumer or commercial purpose. Reves, 494 U.S. at 66.

Regarding the fourth Reves factor, the Court finds that there was no regulatory scheme alleged by Sias that was designed to protect and reduce the risk of his investment, so as to render unnecessary the need for protection under the SEA.[6] Further, even if Sias believed his investments were safe or guaranteed or were told they were guaranteed, does not negate a finding that the investment is a security. Compare S.E.C. v. Edwards, 540 U.S. at 397 (holding that "an investment scheme promising a fixed rate of return can be an 'investment contract' and thus a 'security' subject to the federal securities laws.") with Marine Bank v. Weaver, 455 U.S. 551, 558-59 (1982) (finding that a certificate of deposit purchased from a federally regulated bank does not amount to a security where the holder is protected under federal banking laws and the deposits are insured for full payment by the FDIC, thus shielding the holder of the debt from the borrower's insolvency.).

In short, there is nothing about the three schemes alleged in Sias' Complaint to suggest that they were the type of investments that Congress sought to exclude from the domain of the SEA. Rather, based on the allegations of the Complaint, it is evident that it is the return on the

---

[6]    As to the Clarke Trust Scheme, even though Sias asserted that he believed the investment was insured by FDIC, there is nothing in the Complaint that states the investment was insured by FDIC.

investments–whether in the form of interest or profits—that was the driving force behind each venture and that these ventures were promoted to a number of people and not just Sias. Further, there is nothing in the Complaint to support Sias' argument that he or anyone else was making a loan to any of the promoters of the schemes.  Applying the Reves factors, the Court finds that the transactions do not resemble in any manner the type of notes that the Supreme Court has determined to be outside the reach of the SEA, and therefore, finds that they are not notes under Reves.[7]  However, having reached that conclusion does not end the matter.  The Court must now determine whether the schemes are investment contracts under Howey, as argued by Herzog and Nernoff.

### 2.    The Schemes Are Investment Contracts

In analyzing the "investment of money" prong of the Howey test, the Court finds that Sias did invest money in the various schemes—$35,000 in GBS, $450,000 in Claude White, and $150,000 in the Clarke Trust—and therefore, the first prong of the Howey test has been met. Compl. ¶¶ 58-60.

With respect to the second Howey prong—the existence of a common enterprise—in light of splits among the courts around the country, the Court analyzes all three schemes for

---

[7]    As to Sias' argument that the Clarke Trust Scheme is expressly excluded from coverage as a security because the maturity date was less than nine months, the Court finds there is nothing alleged in the Complaint to suggest that the Clarke Trust Scheme was to mature in eight weeks.  At most, Sias alleged that he was given one chart that indicated that a $100,000 investment would grow to $9,679,102 in eight weeks. Compl. ¶ 45(b). The balance of the allegations about the Clark Trust placed no limit on its duration.  Therefore, the Court cannot conclude that the Clarke Trust Scheme is expressly excluded from coverage as a security.

horizontal commonality and strict vertical commonality.[8]   In so doing, the Court finds, as to the

"common enterprise" prong of the <u>Howey</u> test, that all three schemes were predicated on

horizontal commonality and strict vertical commonality.

Strict vertical commonality exists in all three schemes because Sias has alleged that

the fortunes of the investors were tied to the fortunes of the promoters.  <u>See</u> <u>Revak</u>, 18 F.3d at

88 ("Strict vertical commonality" requires that the fortunes of investors be tied to the fortunes of

the promoter.").  In this regard, in the GBS Scheme, it is evident that Herzog was a promoter

as well as an investor of the scheme.  <u>See</u> Compl. ¶¶ 29, 56.  In the Claude White Scheme,

Sias alleged that White had permitted Sias and other individuals to "piggyback" on "his

investment in another prime bank trading investment program" and "had 'almost all' the money

he needed."  Compl. ¶¶ 35, 37.  Further, in a letter from Claude White to Sias, White stated

that he had hired an attorney to check "on <u>our</u> interest," and that he had tried "several other

things to generate funds to satisfy <u>our</u> obligation." Compl. ¶ 57 (emphasis added).  These

allegations suggest that Sias would be joining White in the prime bank trading investment

program.  In the Clarke Trust Scheme, Sias alleged that he had received a Fee Agreement,

which was designed to cause Sias and other victims to believe that the involved defendants

would receive money only if Sias and the other victims made money on their investments."

Compl. ¶ 46. Further, in the Clarke Trust Scheme, defendants faxed a letter to Sias and other

---

[8]   The Court will not analyze whether broad vertical commonality exists or is enough to establish a common enterprise because like the <u>DeWit</u> court, this Court agrees with the Second Circuit that "[i]f a common enterprise can be established by the mere showing that the fortunes of investors are tied to the efforts of the promoter, two separate questions posed by Howey-whether a common enterprise exists and whether the investors' profits are to be derived solely from the efforts of others-are effectively merged into a single inquiry: 'whether the fortuity of the investments collectively is essentially dependent upon promoter expertise.'"

victims, which stated that "It is apparent to me that <u>our trust</u> (<u>mine</u>, my clients, yours, your clients) was misplaced by Victor Clarke."  Compl. ¶ 55(k) (emphasis added).  These facts establish that Sias' fortunes were interwoven with the fortunes of the promoters of the various schemes.

Horizontal commonality also has been alleged by Sias with respect to all three schemes.  In GBS, investor funds were "pooled to purchase a $250,000 letter of credit."  Compl. ¶ 29.  In the Claude White Scheme, Sias stated that White had permitted Sias and other individuals to "piggyback" on "his investment in another prime bank trading investment program."  Compl. ¶ 37.  In the Clarke Trust Scheme, "[p]rofits accumulated in the Investor's name in an <u>Internal Pool</u> in Private Banking in another Financial Institution."  Compl. ¶ 45(a) (emphasis added).  Further, in the Clarke Trust Scheme, in a November 12, 2001 letter, defendants stated that "Victor Clarke has been called by the major bank in NYC who is holding <u>our profits</u> for the above program. . . . .  They may not know what would happen if a refund is made from a <u>pool</u> that has been committed."  Compl. ¶ 54(b) (emphasis added).  Additionally, an e-mail sent by a defendant to Sias and other victims stated that the defendant would assume the responsibilities of resolving the issues "on behalf of the <u>investment group</u>."  Compl. ¶ 55(j) (emphasis added).  By alleging in both the GBS Scheme and the Clarke Trust Scheme that Sias' funds would be pooled with others, and that in the Claude White Scheme, Sias and others would be able to participate with Claude White in his investment program, Sias has alleged horizontal commonality.

---

<u>Revak</u>, 18 F.3d at 88; <u>DeWit</u>, 879 F.Supp.2d at 979.

Finally, in analyzing the "expectation of profit from the effort of others" prong of the Howey test, the Court finds that Sias expected profits derived solely from the efforts of others. There is nothing in the Complaint to intimate that Sias was to use his own efforts to earn a return on his investment. Moreover, as discussed under the Reves analysis, even though Sias was allegedly promised a fixed rate of return on his investments—GBS guaranteed a return of his principal and 8% interest with regard to the underlying letter of credit, the Claude White Scheme investment was supposedly guaranteed regardless of White's or the European bank's performance, and the Clarke Trust Scheme investment was deposited in an non-depleting account where his principal would remain in tact regardless of the Trust's success— Sias was still relying on the efforts of others to obtain the fruits of the investments for him. See S.E.C. v. Edwards, 540 U.S. at 397 (holding that "an investment scheme promising a fixed rate of return can be an 'investment contract' and thus a 'security' subject to the federal securities laws.").[9]

Accepting the facts as alleged in the Complaint as true, this Court finds that they allege investment contracts as articulated by the Supreme Court in Howey. Like Howey, this Court finds that all of the elements of a profit-seeking business venture are present here: Sias and the other investors provided capital and shared in the earnings; the promoters managed, controlled and ran the enterprises. See Howey, 328 U.S. at 310. As such, the schemes

---

[9]     In reaching this holding, the Supreme Court cited to SEC v. Universal Service Assn, 106 F. 2d 232, 234, 237 (7th Cir. 1939) stating that the court had accepted "the SEC's position that an investment scheme promising 'assured profit of 30% per annum with no chance of risk or loss to the contributor' was a security because it satisfied the pertinent substance of the Howey test, '[t]he investment of money with the expectation of profit through the efforts of other persons.'"

alleged are "securities" and the RICO claims cannot stand.[10]  Therefore, the Court recommends that Herzog's and Nernoff's motions to dismiss be granted with respect to the RICO claims.[11]

### E.    Subject Matter Jurisdiction Over Sias' State Claims

In light of this Court's finding that Sias cannot proceed with his claims under RICO, all of the federal claims that conferred jurisdiction in this Court are gone.  Consequently, the Court declines to exercise supplemental jurisdiction over his remaining state claims (deceptive trade practices, false statement in advertising, common law fraud, and violation of the Uniform Fraudulent Transfers Act under California law).  See Russell v. Hennepin County, No. 03-4889 (PAM/RLE), 2004 WL 2370681, at *3 (D. Minn. Oct. 08, 2004) (citing 28 U.S.C. § 1367(c)(3)).

## IV.    RECOMMENDATION

For the reasons set forth above and based on all the files, records, and proceedings herein **IT IS RECOMMENDED** that:

1.    Defendant Byron Nernoff's Motion for Summary Judgment [Docket No. 40] be

       **GRANTED**.

2.    Defendant Fred Otto Herzog's Motion to Dismiss [Docket No. 41] be

       **GRANTED**.

---

[10]    The SEC also found that the GBS Scheme constituted an investment contract.  See Def. Herzog Mem., Ex. A (SEC v. Calvin, 03-CV-10586-MEL, at 1 (D. Mass. Oct. 5, 2004).

[11]    Because the Court has found the schemes to be investment contracts, and cannot be pursued under RICO, the Court need not address Nernoff's claim that the statute of limitations for a securities suit expired before Sias commenced his action.

3.   Counts One through Six against Herzog, and Count Two against Nernoff be **DISMISSED WITH PREJUDICE**.

4.   Count Two against Nernoff be **DISMISSED WITH PREJUDICE**.

5.   Counts Seven through Ten against Herzog and Nernoff be **DISMISSED WITHOUT PREJUDICE**.[12]

Dated:          July 25, 2006

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before **August 14, 2006** a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before **August 14, 2006**.

---

[12]   Sias stated in his Complaint that this Court maintained federal question jurisdiction, 28 U.S.C. § 1331, through the claims brought under the federal RICO statute. Compl. ¶ 18. Sias also stated that his state claims were so related to his federal claims that they form part of the same case or controversy, and therefore, the Court maintained supplemental jurisdiction over the claims pursuant to 28 U.S.C. § 1367. Id. While the Court has declined to exercise supplemental jurisdiction over Sias' state claims, it is possible that Sias could assert claims in this Court against Nernoff, alleged to be a citizen of New York, based on diversity jurisdiction. Compl. ¶ 14. In addition, while this Court does not have diversity jurisdiction as to Herzog because Sias and Herzog are both from Minnesota (Compl. ¶¶ 1-2), there is nothing to preclude Sias from pursuing his state claims in state court. Therefore, this Court is recommending dismissal of Counts Seven through Nine, without prejudice.